**Wilbur HAMPTON, Plaintiff-Respondent,**

v.

**Ruth LOPER, Defendant-Appellant.**

No. 8466.

Springfield Court of Appeals.

Missouri.

April 8, 1966.

Rehearing Denied May 6, 1965.

Application to Transfer Denied June 13, 1966.

Marvin E. Jones, Powell, Jones & Ringer, Dexter, J. Lee Purcell, Hyde, Purcell & Wilhoit, Poplar Bluff, for defendant-appellant.

Joe C. Welborn, James E. Spain, Briney, Welborn & Spain, Bloomfield, for plaintiff-respondent.

HOGAN, Judge.

This is an action to recover damages for personal injuries sustained as a result of a termite spraying operation. The plaintiff had judgment on a jury verdict in the sum of $1,500.00, and the defendant has appealed.

In September 1963, the plaintiff and his wife lived in one of three rental houses owned by the defendant. They rented the house on a month-to-month basis, and at

the time in question they had lived there "around twelve years." Nothing is shown about the size or construction of the house other than that it had a living room, a kitchen, a bathroom, at least one "back bedroom," and no basement.

The work involved—the termite spraying operation—was done by Mr. Charles Bradshaw, who said he had been in the termite spraying business for about twelve years and "worked" the area regularly. A day or two before the actual spraying was done, either Mr. Bradshaw or one of his employees asked the defendant's permission to inspect her property to determine if the houses were infested with termites. Finding that all of them were, Mr. Bradshaw solicited the job of extermination. The agreement with Bradshaw was oral; Mrs. Loper's description of it was that "the three houses were to be termited and I was to pay him a certain sum, and that was all there was * * *." Mr. Bradshaw selected the exterminating compound, applied it with his own equipment, and was assisted by his own employees. He also undertook to guarantee his work in advance. Before he began his work, Mr. Bradshaw presented Mrs. Loper with a "Warranty Bond," a writing which represents that "the chemicals used by the Bradshaw Termite Control for Termite Extermination are guaranteed to be highly toxic to subterranean termites and other wood eating insects and to be entirely effective for the control of such pests," and goes on to state that if reinfestation of the property should appear within five years the warrantor will treat the property again without cost. It does not appear that there was any discussion between Mrs. Loper and Mr. Bradshaw about the methods of applying the pesticide, nor that Mrs. Loper had any knowledge, through past experience or otherwise, of the nature of the extermination process or of the chemical compound to be used, other than such information as may have been imparted by the "Warranty Bond."

On September 18, 1963, using a compound known as chlordane, diluted eighty to one with water, which he applied with his own equipment and with the assistance of his own employees, Bradshaw undertook to exterminate the termites in the house occupied by the plaintiff and his wife. The record is not at all clear as to where the chemical was applied; there are some references to the "understructure" of the house, and it is inferable that Bradshaw went under the house to spray the foundation and the subfloor. He applied the diluted chlordane with a power sprayer and, depending on whether one accepts his trial testimony or his pre-trial deposition, used either eighty gallons or two hundred gallons of the emulsion.

Mr. Hampton and his wife were both employed, and on September 18, 1963, when the extermination work was done, they were away from home. When they returned in the afternoon, about 5:00 P.M., they immediately entered the house and "noticed a strange odor." Mr. Hampton then went to the "back bedroom" and turned on an exhaust window fan. He then went to the kitchen and ate a piece of apple pie which his wife had baked that morning before leaving home. The pie was sitting on a kitchen cabinet near the sink, which was near an open window. After eating the pie, Mr. Hampton went to the "back bedroom" to take a nap, but within fifteen, possibly thirty, minutes he became violently ill. There is no question that Mr. Hampton was ill for some time after this incident, and there was medical evidence that Mr. Hampton had been poisoned by the spray.

Originally, the plaintiff joined Mr. Bradshaw, Mrs. Loper and the distributor of the pesticide as defendants, setting up in his petition Mrs. Loper's negligence in failing to inform him of the spraying operation, Mr. Bradshaw's negligence in applying the pesticide, and the supplier's negligence in labeling it, all as direct causes of his injuries. On motion, the case was dismissed as to the supplier, and at the close of all the evidence the plaintiff voluntarily dismissed without prejudice as to Mr. Brad-

shaw. The cause went to the jury solely upon Mrs. Loper's negligence in failing to warn the plaintiff of the presence of chlordane on the premises, and recovery was predicated upon the defendant's actual or constructive knowledge that chlordane is a poisonous and toxic substance to human beings, and her constructive knowledge that the spraying operation was likely to be dangerous to the plaintiff. The defendant filed a motion for directed verdict at the close of all the evidence, on the ground that there was no evidence of any negligence on Mrs. Loper's part, and an alternative after-trial motion for judgment or for new trial, setting up that there was no evidentiary support for a finding that Mrs. Loper knew, or should have known, of the properties of the chemical used. In this court, the appellant argues that the meritorious point for discussion is whether, upon the record presented, Mrs. Loper was negligent in failing to warn Mr. Hampton of the presence of chlordane, inasmuch as she had no actual knowledge of the character and nature of the chemical, and because, as a person of ordinary or common education, she cannot be charged with constructive knowledge of the dangers, if any, attendant upon its use. We have concluded that the defendant's motion for directed verdict should have been sustained; but, in order to make the basis of our opinion clear, it is necessary to reiterate briefly certain basic principles which led us to this conclusion and to consider briefly the respondent's theories of Mrs. Loper's liability.

▄▄▄ The plaintiff, representing his case to be similar to those dealing with a landlord's duty in making repairs, argues that Mrs. Loper had actual or constructive knowledge of a dangerously toxic amount of pesticide on the Hampton premises, but that Mr. Hampton did not, and therefore, in failing to warn Mr. Hampton of the presence of chlordane, she breached her duty to inform the plaintiff of a concealed dangerous condition on the premises. Plaintiff says that since the "Warranty Bond" recited that the chemicals to be used were "guaranteed to be highly toxic to subterranean termites and other wood eating insects," Mrs. Loper knew or should have anticipated the "dangerous condition" of the Hampton house when the plaintiff returned from work after the spraying was done. In our view, the plaintiff's position is too extreme. There is no question that in some cases involving negligent repair, as well as in cases involving the original delivery of leased premises, our courts have applied the rule that "a lessor of land, 'who conceals or fails to disclose to his lessee any natural or artificial condition involving unreasonable risk of bodily harm * * is subject to liability * * * if (a) the lessee does not know of the condition or the risk involved therein, and (b) the lessor knows of the condition and realizes the risk involved therein and has reason to believe that the lessee will not discover the condition or realize the risk.'" Roach v. Herz-Oakes Candy Co., 357 Mo. 1236, 1244, 212 S.W.2d 758, 763 [5]; Bartlett v. Taylor, 351 Mo. 1060, 1069, 174 S.W.2d 844, 849 [6]; Restatement, Torts, Section 358, p. 969 (1934). But if this principle is applicable here by analogy, one must bear in mind that the landlord's liability is conditioned upon knowledge sufficient to cause a reasonably prudent man to appreciate the dangerous character of the condition causing harm, and the landlord is not bound to foresee results which only a person with specialized knowledge would apprehend. Kennedy v. Hartwig-Dischinger Realty Co., Mo.App., 201 S.W.2d 475, 479 [2, 3]; Meade v. Montrose, 173 Mo.App. 722, 726, 160 S.W. 11, 13 [5]; 2 Harper & James, Torts, Section 27.16, pp. 1508–1509, and authorities cited note 16 (1956); Prosser, Torts, Section 80, pp. 466–467 (2d ed. 1955). All the knowledge Mrs. Loper is shown to have had in this case was that the pesticide which Mr. Bradshaw proposed to use was guaranteed by him to be effective. There is no evidence tending to establish that she knew how it was to be used nor the quantity that was to be applied. It seems clear to us that the toxicity of synthetic chlorinated hydrocarbons—of which this pesticide was

testified to be composed—is a matter of technical cognizance, and that an appreciation of the dangers attending its use would require a more advanced level of knowledge or experience than that to which men of ordinary education could be held.

Further arguing along this same line, the plaintiff draws a parallel between Vitale v. Duerbeck, 332 Mo. 1184, 62 S.W. 2d 559, and this case, and maintains that the verdict should be upheld on the principle that a landlord will be held liable for negligent or defective repairs, even though the work is done by an independent contractor. We need not consider, however, whether the analogy is apt, or whether, had Bradshaw's negligence been submitted as a ground for recovery, the evidence would support the verdict. The case was submitted solely upon defendant's negligence in failing to warn the plaintiff of the presence of chlordane. In general, a plaintiff is held in the appellate court to the same theory upon which he submitted his case in the trial court; and, if no case is made on the issue or issues actually submitted, the trial court errs in not directing a verdict. Blankenship v. St. Joseph Fuel Oil & Mfg. Co., 360 Mo. 1171, 1180, 232 S.W.2d 954, 960 [11–13]. Even if it be assumed that Mr. Hampton's injuries resulted from some negligence on Bradshaw's part in the use of the pesticide, the plaintiff abandoned that claim of negligence or liability by submitting his case solely upon Mrs. Loper's failure to warn him of the spraying operation. Guthrie v. City of St. Charles, 347 Mo. 1175, 1182, 152 S.W.2d 91, 93 [1]; Haire v. Stagner, Mo.App., 356 S.W.2d 305, 308 [2, 3].

We are aware that there are instances in which a landlord has been held liable for injuries resulting to his tenant because of the use of poisonous chemicals to exterminate vermin. Anno., 73 A.L.R.2d 1155, 1156, note 1 (1960). It would serve no useful purpose, however, to collate those cases and compare them to the instant case. In the so-called "exterminator" cases, the landlord's liability has generally been predicated upon his use of a compound—cyanide—likely to cause injury, even though the utmost care is used. Granted there may be some hazard attendant upon the use of chemical pesticides composed of chlorinated cyclic hydrocarbons, and granted further that the risk may be scientifically greater than is commonly realized, the record before us does not make out a case of ultrahazardous activity.

For the reasons indicated, the judgment is reversed, and the cause is remanded with directions to enter a judgment for the defendant in accordance with defendant's motion for judgment or for new trial.

STONE, P. J., and RUARK, J., concur.